## Ward, Appellant, *v.* Ward.

Argued December 11, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*J. Ambler Williams,* and with him *A. Archer Cross,* for appellant.

*Lester S. Hecht,* and with him *High, Dettra & Swartz,* for appellee.

Opinion by Keller, J., March 13, 1935:

This action of divorce was brought by a husband against his wife on the grounds of (1) desertion, (2) cruel and barbarous treatment and (3) indignities to the person. The respondent appeared to the alias writ and filed an answer denying the charges in the libel. The case was referred to a master, who after a full hearing, covering over three hundred pages of testimony, recommended a divorce on the ground of desertion. By agreement of counsel it had been stipulated of record that no testimony would be taken on any other ground than desertion. Exceptions to the report were sustained by the court below and a decree was entered dismissing the libel. We have carefully read and reread the testimony and our judgment

agrees with the master rather than the court. The evidence establishes to our satisfaction that the respondent, on August 26, 1930, without a reasonable cause or legal justification, left the home of the libellant, and from that date has continuously and uninterruptedly, for more than two years, absented herself from his habitation; that such separation was not by the direction, or with the consent, of the libellant, but against his protest, and constituted wilful and malicious desertion within the meaning of our divorce code, (Act of May 2, 1929, P. L. 1237).

Much of the evidence in the case is not in dispute. Where it is in dispute, we believe for the most part, for the reasons hereinafter set forth, the testimony of the libellant rather than the respondent.

The parties were married on July 2, 1923. They have no children. The respondent had been married before and had a son by such marriage, who, however, did not live with them. They lived together as husband and wife at various residences in the City of New York,—the last being 124 East 40th Street,—until August 26, 1930, when during his absence from the country she removed from the apartment, and has since refused to live with him. He had formerly lived at Bala-Cynwyd in this State, and in December, 1930, removed from New York City to Bala-Cynwyd, where he has since resided.

At the time of the respondent's leaving the libellant's home he was vice-president of Geyelin & Company, a corporation engaged in business as steamship agents. The business in 1930 was not successful and he was required to go on a business trip to Europe in an effort to keep it off the rocks. He informed her that he would have to sail on August 1, to be gone less than four weeks, returning August 26. She wanted to go along. He told her it was impossible because Geyelin & Company were almost in bankruptcy and he

could not afford to take her and that, besides, it was a hurried business trip, without time for travel, and she had been to Europe twice on long trips without him. She threatened that, if he did not take her along, she would leave him, as she had done on three or four other occasions for short periods. This was followed by a dispute as to how much money he should leave with her for spending money, over and above rent and living expenses. She demanded $200; he said $150 was all he could afford and should be sufficient for the twenty-six day interval. The dispute became somewhat heated, but he left her $150, all of which, after conflicting statements, she admitted she spent on clothes. The chief difference in their stories relates to this episode. The respondent testified that the libellant called her vile names and told her to get out; but she admitted that she did not believe that he meant it. On the other hand, he denied any such remark, and while he admitted that the talk between them was heated, it was due to her unreasonable insistence on accompanying him on the trip and to her demand for $50 more spending money than he could afford to leave. Nothing in this episode, nor in the previous disputes and misunderstandings between them furnished any legal justification for her leaving him. We are satisfied that he did not tell her to go nor consent to her departure from the common home. He left the house the next morning, to take the boat, while she was in bed. There was then no discussion. She later went out but did not go to see him embark, and telephoned his parents who had come to New York to see him off, that she was not going to the pier. She stayed in their home in the apartment house until August 26, the day of his expected return, when with no word to him of her whereabouts, or explanation of her going, she left the apartment and took up her residence in a nearby hotel which looked out on their apartment, and

from which she could watch him in their former home. He inquired of the superintendent of their apartment house whether she had left any message and was told 'No.' She called him up by telephone twice on the morning of September 3, but did not tell him where she was living. She told him she had left, that she intended to stay away and that she wanted arrangements made at once for her support. Her talk, both times, was abusive. She evidently consulted an attorney immediately after she left the common home, if not before, and on September 9, 1930, her attorney wrote to libellant's attorney, who had been consulted in an endeavor to patch the matter up, that there was no chance of reconciliation, and that it was incumbent on the husband to make provision for the separate maintenance of his wife. When the libellant and respondent did meet she refused his request to return home and in November, 1930 she told him she would move back, only on condition that he would get out, which he refused to do. She brought proceedings against him in New York for separation and maintenance, in which she admittedly made false statements as to her income, and apparently, also as to his, as a result of which she obtained a court order against him for maintenance in the amount of $50 a week. This action was not a suit for divorce, but one for maintenance, similar to proceedings for support, and does not come within our ruling in Sperling v. Sperling, 82 Pa. Superior Ct. 308, or Zeiler v. Zeiler, 58 Pa. Superior Ct. 220, which is confined to actions in divorce. See also Gilbert v. Gilbert, 108 Pa. Superior Ct. 351, 164 A. 103. She has, throughout the case, shown no disposition, willingness or desire to return to him and live with him in the marital relation, her efforts being devoted to attempts to obtain separate maintenance and support. On December 3, 1930, during his absence, she removed the furniture from the apartment and

left it unfit for occupancy, requiring him to move to a hotel.

We are of opinion that the evidence discloses no reasonable ground for the respondent leaving the habitation of her husband, and as it was without his consent and against his protest, it amounted in law to wilful and malicious desertion, and was sufficient cause for a divorce on that ground at the suit of her husband, at the end of two years, unless during that period she made a bona fide attempt at reconciliation, manifested by an expressed desire to return and resume marital relations. She admitted that she never offered to come back, or told him she wanted to go back, while he testified that on a number of occasions he asked her to return. See Scholz v. Scholz, 113 Pa. Superior Ct. 359, 364. We think the *undisputed* evidence bears out his story to some extent, for she would scarcely have laid down the terms on which she was willing to move back to the home—viz., that he would "get out"—unless he had asked her to return.

But apart from this, if her leaving the common home was without reasonable cause or legal justification, and was not by his consent but against his protest, and thus was a wilful and malicious desertion as defined by the law, he was under no duty to seek a reconciliation and ask her to come back. In such case it is the duty of the deserting spouse to seek the reconciliation and make the offer to return: Murray v. Murray, 80 Pa. Superior Ct. 575. Until this is done the innocent spouse does not consent to the separation merely because he or she is not active in seeking a reconciliation. If the deserting spouse offers, in good faith, to come back within the two year period following the desertion, the innocent spouse must receive him or her, or the separation, thereafter, becomes consentable and is no longer wilful and malicious desertion; but there is no legal duty on an innocent spouse to seek a recon-

ciliation with and the return of a spouse who is guilty, of wilful and malicious desertion. He or she must leave the door open for two years; but is not required to go beyond this, and make active efforts to induce the deserting spouse to come back. There is no difference in this respect, in this State, between a husband and wife. The law puts them on an equality. If either spouse consents to the separation, either expressly or by fair implication, the separation does not become wilful and malicious desertion, until he or she in good faith seeks a reconciliation and asks the other to come back: Weisbrod v. Weisbrod, 103 Pa. Superior Ct. 267, 156 A. 542. On the other hand, where the separation is without reasonable cause or legal justification and the other spouse has not directed, or consented to, the separation, either expressly or by fair implication, the departure from the common home in such case is wilful and malicious desertion and continues to be such until the deserting spouse in good faith seeks a reconciliation and offers to go back and resume marital relations.

Our reason for believing the testimony of the libellant rather than the respondent, where they are essentially different, is that in every instance of such difference, where there was a means of checking up the truth or falsity of the respective stories, hers was found to be false. Several times she admitted having testified falsely. In other instances the testimony of absolutely disinterested witnesses convicted her of having made false statements. We refer to her false statements to the New York courts as to her employment, (p. 171a), and her possession of money; her statements as to her age, (pp. 172a, 173a-177a), which, while not material, show her disregard for the sanctity of an oath; her testimony as to her lack of knowledge of her brokerage accounts; as to her payment of her expense at a hospital in Cleveland; and her having

given her husband a power of attorney to draw checks on her account in the Central Hanover Bank and Trust Co. (p. 323a-327a). These are only a few out of many such instances. While not bearing directly on the question of desertion they throw light on the unreliability of the respondent's testimony and lead us to believe libellant's story, rather than hers, where their evidence is materially different: Boyd's Exr. v. Boyd, 100 Pa. Superior Ct. 571.

The first five assignments of error are sustained. The decree is reversed and the record is remitted to the court below with instructions to enter a decree divorcing the libellant from the bond of matrimony with the respondent. Costs on this appeal to be paid by appellee.